UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

ANDREW RINGEL,

                Plaintiff,

      -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, NAIYMA MOORE-
ALLEN, and MIATHERESA PATE,

                Defendants.
--------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
19-CV-2374 (DG) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

      On April 23, 2019, Plaintiff Andrew Ringel ("Ringel") initiated this action against

the New York City Department of Education (the "DOE") and Naiyma Moore-Allen,

the Principal of the Waverly School of the Arts ("P.S. 156"). (*See* Complaint ("Compl."),

ECF No. 1.) On October 1, 2019, Ringel filed an amended complaint adding Defendant

Miatheresa Pate, the Community Superintendent for District 23. (*See* Amended

Complaint ("Am. Compl."), ECF No. 21.) Ringel asserts religion and race-based

discrimination and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights

Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (*Id.*) Ringel also alleges a claim

for false arrest pursuant to 42 U.S.C. § 1983 ("§ 1983"), arising out of an incident at P.S.

156 on September 27, 2018. (*Id.*)

      The gravamen of Ringel's Title VII, NYSHRL, and NYCHRL discrimination

claims is that Defendants created a hostile work environment by failing to adequately

address the harassment he faced from one of his fourth-grade students, referred to

herein as "J.J.," who repeatedly made threats and derogatory comments on the basis of Ringel's religion (Jewish) and race (White). (*See id.* ¶¶ 19–25, 27–29, 32, 36–39, 42–46, 57, 63, 69.) Ringel also alleges that Defendants unlawfully retaliated against him for complaining about J.J.'s behavior by issuing him disciplinary letters, substantiating false allegations of misconduct against him, and ultimately, discontinuing his employment. (*See id.* ¶¶ 26, 30–31, 33–35, 40–41, 47, 49, 53, 58–59, 64–65, 70–71.)

Currently before this Court is Defendants' motion for summary judgment as to all of Ringel's claims (*see* Defs.' Mot. for Summ. J. ("Defs.' Mot."), ECF No. 47), which the Honorable Diane Gujarati referred to the undersigned Magistrate Judge for a report and recommendation. Defendants assert they are entitled to summary judgment because J.J.'s behavior was not severe or pervasive and they took reasonable actions to address the situation. (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem."), ECF No. 47-1, at 9–15, 17–19.) Defendants also argue that given Ringel's disciplinary history, and in particular, the numerous substantiated allegations of corporal punishment against him, any alleged adverse employment actions he suffered were warranted. (*Id.* at 19–25.) As for Ringel's § 1983 claim, Defendants maintain there was probable cause to prevent him from leaving Defendant Moore-Allen's office on the day of the incident and that she is entitled to qualified immunity. (*Id.* at 25–27.)

As discussed below, resolving contested claims of student-on-teacher harassment and retaliation on summary judgment requires a level of factual clarity that is not present in this case. The record here clearly demonstrates that Defendants acted in response to J.J.'s harassment, and that Defendants had a strong basis to discontinue Ringel at the end of the school year. But because the Court finds there are genuine disputes of material fact as to Ringel's Title VII, NYSHRL, and NYCHRL claims, even if these claims are ultimately unconvincing to a jury, summary judgment should be

denied. Ringel's § 1983 claim, on the other hand, fails as a matter of law. Accordingly, for the reasons set forth below, the Court respectfully recommends that Defendants' motion be granted in part and denied in part.

## BACKGROUND

### I.    Factual Background[1]

#### A.   Ringel's Employment with the DOE

Plaintiff Andrew Ringel was appointed to the DOE for a four-year probationary period on January 10, 2016. (Defs.' Rule 56.1 Statement ("Defs.' 56.1"), ECF No. 47-2, ¶¶ 6–7; Pl.'s Rule 56.1 Counterstatement ("Pl.'s 56.1"), ECF No. 48-1, ¶¶ 6–7.) He initially worked as an interventionist and special education teacher at P.S. 195 for the 2015–2016 and 2016–2017 school years. (Defs.' 56.1, ECF No. 47-2, ¶ 8; Pl.'s 56.1, ECF No. 48-1, ¶ 8.) Ringel then applied to transfer to P.S. 156 and was hired by Defendant Moore-Allen for the 2017–2018 school year. (Defs.' 56.1, ECF No. 47-2, ¶ 11.) At P.S. 156, he worked in a fourth grade Integrated Co-Teaching ("ICT") classroom with a general education co-teacher named Ann Walker. (*Id.* ¶ 13.) ICT classrooms are designed to include up to twelve students who require Individualized Education Plans. (*Id.* ¶ 14.)[2]

During the 2017–2018 school year at P.S. 156, described in detail below, Defendant Moore-Allen recommended that Ringel be discontinued. (*Id.* ¶ 77; Pl.'s 56.1,

---

[1] The following material facts are taken from the evidence submitted by the parties in connection with Defendants' motion and are undisputed unless otherwise noted.

[2] During the 2016–2017 and 2017–2018 school years, Ringel was evaluated on a system that rates teachers on a spectrum of "Highly Effective," "Effective," "Developing," or "Ineffective." (Defs.' 56.1, ECF No. 47-2, ¶¶ 15–16; Pl.'s 56.1, ECF No. 48-1, ¶¶ 15–16.) He received an overall rating of "Effective" for the 2016–2017 and 2017–2018 school years, though he notes that his Measure of Teacher Performance ("MOTP") rating for the 2017–2018 school year was "Developing." (Defs.' 56.1, ECF No. 47-2, ¶ 17; Pl.'s 56.1, ECF No. 48-1, ¶ 17.) Ringel also notes that on March 6, 2018, a member of the P.S. 156 administration informally observed him in the classroom and gave him "Developing" and "Ineffective" ratings, prompting Ringel to file a formal response. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 239–40; Mar. 6, 2018 Observation Report, ECF No. 48-16; Pl.'s Resp. to Mar. 6, 2018 Observation Report, ECF No. 48-17.)

ECF No. 48-1, ¶ 77.)[3] In early September 2018, the school informed Ringel that

Defendant Pate planned to review his pending discontinuance. (Defs.' 56.1, ECF No. 47-

2, ¶ 83; Pl.'s 56.1, ECF No. 48-1, ¶¶ 83, 328; Sept. 4, 2018 Letter, ECF No. 47-30.)

Subsequently, on October 4, 2018, Defendant Pate informed Ringel that she was

affirming the discontinuance of his probationary period, effective that day. (Defs.' 56.1,

ECF No. 47-2, ¶ 87; Pl.'s 56.1, ECF No. 48-1 ¶¶ 87, 331; Oct. 4, 2018 Letter, ECF No. 47-

32.) Ringel then appealed and his case was heard on May 6, 2019, by a three-member

committee of the DOE Office of Appeals and Review. (Defs.' 56.1, ECF No. 47-2, ¶¶ 89–

90; Pl.'s 56.1, ECF No. 48-1, ¶¶ 89–90, 332.) On appeal, two committee members

concluded that the decision to discontinue Ringel should be reversed, but the

committee chairperson found that the decision should be upheld, and therefore, on May

13, 2019, Ringel was informed that his discontinuance had been reaffirmed. (Defs.' 56.1,

ECF No. 47-2, ¶¶ 91–92; Pl.'s 56.1, ECF No. 48-1, ¶¶ 91–92, 337.)[4]

## B. Ringel's Incidents with J.J.

Shortly after transferring to P.S. 156, Ringel, who wore a yarmulke while at

school and identifies himself as an "outwardly Jewish person," began experiencing

difficulties with J.J., one of his fourth-grade students. (Pl.'s 56.1, ECF No. 48-1, ¶ 182;

---

[3] Ringel disputes when Defendant Moore-Allen decided to recommend that he be discontinued. (Pl.'s 56.1, ECF No. 48-1, ¶ 77 (citing Deposition of Naiyma Moore-Allen ("Moore-Allen Dep."), ECF No. 47-8, at 88:18–89:2).) The Court notes that although emails from Moore-Allen indicate that she was preparing to recommend that Ringel be discontinued in February 2018 (*see* February 2018 Emails, ECF No. 48-8), Moore-Allen formally filed the "complete packet" related to her recommendation of discontinuance in May 2018, which Ringel does not dispute. (Moore-Allen Dep., ECF No. 47-8, at 131:6–14; *see also* Pl.'s 56.1, ECF No. 48-1, ¶ 229.)

[4] Ringel points out that Defendant Pate was on maternity leave when the DOE committee issued its report, and that acting superintendent Tamra Collins was the person directed to prepare the letter affirming his discontinuance. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 92, 337 (citing Deposition of Miatheresa Pate ("Pate Dep."), ECF No. 47-29, at 96:16–97:22, 98:3–4; May 13, 2019 Letter, ECF No. 47-33); *see also* May 10, 2019 DOE Mem., ECF No. 47-9.)

Defs.' 56.1, ECF No. 47-2, ¶¶ 103–15.) The first incident occurred on November 21, 2017, when J.J. bent Ringel's finger back and called him a "fucking Jew" as Ringel escorted J.J. out of the school by the hand during a fire drill. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 209–10.) The next day, on November 22, 2017, J.J. called Ringel a "faggot" in class, and then a "bitch ass Jew" and "stinky breath" while Ringel escorted J.J. by the hand to Dean Ana Haynes' office. (Pl.'s 56.1, ECF No. 48-1, ¶ 213; Pl.'s Notebook, ECF No, 48-6, at 2.)[5]

Throughout the school year, the clashes between Ringel and J.J. escalated. For example, on December 12, 2017, J.J. called Ringel a "stinky ass n*****" and a "fucking stinky Jew" while in class. (Pl.'s 56.1, ECF No. 48-1, ¶ 216; Pl.'s Notebook, ECF No, 48-6, at 5.) On January 11, 2018, as Ringel tried to persuade J.J. to go back into science class, J.J. told Ringel, "shut up white boy n*****." (Pl.'s 56.1, ECF No. 48-1, ¶ 218; Deposition of Andrew Ringel ("Pl.'s Dep."), ECF No. 47-5, at 43:24–44:2.) On March 16, 2018, J.J. said to Ringel: "I will punch you in the face, fuck you." (Pl.'s 56.1, ECF No. 48-1, ¶ 261; Pl.'s Notebook, ECF No. 48-6, at 11.) On April 10, 2018, Ringel complained that J.J. was throwing pencils and books at him and making other disparaging remarks about Ringel's Judaism. (Pl.'s 56.1, ECF No. 48-1, ¶ 282; Pl.'s Notebook, ECF No. 48-6, at 19.)

On April 17, 2018, J.J. made a shooting motion with his hand toward Ringel, causing Ringel to file a complaint with the NYPD. (Defs.' 56.1, ECF No. 47-2, ¶ 115; Pl.'s 56.1, ECF No. 48-1, ¶¶ 285, 289; Pl.'s Notebook, ECF No. 48-6, at 22.) Ringel then filed a formal police report against J.J. on May 3, 2018, after J.J. said to him: "shut the fuck up; I wish you were dead." (Pl.'s 56.1, ECF No. 48-1, ¶ 296; Pl.'s Dep., ECF No. 47-5, at 78:6–12; Pl.'s Notebook, ECF No. 48-6, at 32.) And on May 7, 2018, J.J. told Ringel to "shut the

---

[5] The page numbers cited for Ringel's notebook refer to the PDF page number rather than the Bates Stamp.

fuck up" and threatened to beat Ringel up. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 304–05; Pl.'s Dep., ECF No. 47-5, at 82:17–83:6.)

J.J. also acted out toward other students and staff. (Defs.' 56.1, ECF No. 47-2, ¶¶ 105–07.) For example, J.J. called Ringel's co-teacher, Ann Walker, derogatory terms such as "fat bitch" and "fat N word." (*Id.* ¶ 106.) But according to Ringel, J.J. did not target others at the same rate as him, or on the basis of their religion. (Pl.'s 56.1, ECF No. 48-1, ¶ 106 (citing Pl.'s Dep., ECF No. 47-5, at 34:9–20, 107:1–3).)

### C. Ringel's Complaints About J.J.'s Behavior and P.S. 156's Response

Ringel reported the above-mentioned incidents to Defendant Moore-Allen, Dean Haynes, and Assistant Principal Ayesha LaMont-Agard ("AP LaMont-Agard") on a regular basis throughout the 2017–2018 school year. (Defs.' 56.1, ECF No. 47-2, ¶ 103; Pl.'s 56.1, ECF No. 48-1, ¶¶ 184–85; Declaration of Andrew Ringel ("Pl.'s Decl."), ECF No. 48-3, ¶ 8.) For example, on November 21, 2017, Ringel "verbally reported" the fire drill incident to Defendant Moore-Allen and also raised it with Dean Haynes. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 211–12; Pl.'s Decl., ECF No. 48-3, ¶ 11.) Following this incident, Dean Haynes met with Ringel and J.J. and explained to J.J. that he needed to behave differently in class. (Defs.' 56.1, ECF No. 47-2, ¶¶ 109–10 (citing Pl.'s Dep., ECF No. 47-5, at 31:8–32:4); Pl.'s 56.1, ECF No. 48-1, ¶¶ 109–10.)[6]

On December 4, 2017, Ringel emailed Defendant Moore-Allen, Dean Haynes, and AP LaMont-Agard about J.J.'s generally "disruptive" and "disrespectful" behavior, and asked for their assistance. (Pl.'s 56.1, ECF No. 48-1, ¶ 214; Dec. 7, 2017 Email, ECF No.

---

[6] While Ringel appears to dispute Defendants' characterization of this meeting, he does not dispute that such a meeting occurred on or about November 22, 2017, or that Dean Haynes explained to J.J. that "he needed to behave a certain way in class[.]" (Pl.'s 56.1, ECF No. 48-1, ¶¶ 109–10; *see also* Pl.'s Dep., ECF No. 47-5, at 31:1–32:4.)

48-14.)[7] Ringel also emailed Dean Haynes after the December 12, 2017 incident, during which J.J. called Ringel a "stinky ass n*****" and a "fucking stinky Jew." (Pl.'s 56.1, ECF No. 48-1, ¶¶ 216–17.) The record further shows that Ringel emailed the P.S. 156 administrators on January 30, 2018, to document J.J.'s violent behavior toward the other students and to ask for assistance. (*Id.* ¶ 219; Jan. 30, 2018 Email, ECF No. 48-15.) Additionally, Ringel raised J.J.'s ongoing use of racial and religious slurs during two disciplinary meetings that Ringel had with the school administration on February 14, 2018, and February 26, 2018, respectively. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 234–36, 238; Pl.'s Decl., ECF No. 48-3, ¶¶ 15, 17.)

In general, Dean Haynes recalled speaking with J.J. "on many occasions" and in "[m]any situations," but did not remember the extent of specific disciplinary actions taken in response to J.J.'s derogatory comments toward Ringel. (Defs.' 56.1, ECF No. 47-2, ¶ 111 (citing Deposition of Ana Haynes ("Haynes Dep."), ECF No. 47-34, at 33:4–9); Pl.'s 56.1, ECF No. 48-1, ¶ 187; *see also* Haynes Dep., ECF No. 47-34, at 40:20–42:23.) Similarly, Defendant Moore-Allen recounted participating in parent meetings with J.J.'s guardian and caseworker, but did not recall her responses to each of Ringel's complaints about J.J. (Moore-Allen Dep., ECF No. 47-8, at 58:18–21, 65:15–66:4; *see also* Pl.'s 56. 1, ECF No. 48-1, ¶ 215.)

In addition, the P.S. 156 guidance counselor who worked with J.J. during the 2017–2018 school year, Theola Miller-Bovain, stated that she heard J.J. call Ringel derogatory names on more than one occasion. (Pl.'s 56.1, ECF No. 48-1, ¶ 188 (citing Deposition of Theola Miller-Bovain ("Miller-Bovain Dep."), ECF No. 47-13, at 34:17–

---

[7] The Court notes that though this email is co-signed by Ringel and Ms. Walker, Ms. Walker denied writing emails to the school administration together with Ringel. (Deposition of Ann Walker ("Walker Dep."), ECF No. 47-27, at 16:21–25, 17:12–15.)

35:14).) Ms. Miller-Bovain recalled that she would "[h]ave a session" with J.J. to address these incidents, and also informed the school administration. (Miller-Bovain Dep., ECF No. 47-13, at 35:21–36:3, 36:11–20, 37:11–21; Pl.'s 56.1, ECF No. 48-1, ¶ 189.) Ms. Miller-Bovain stated that at one point, she was directed by Defendant Moore-Allen to help come up with a behavior plan for J.J. (Pl.'s 56.1, ECF No. 48-1, ¶ 194; Miller-Bovain Dep., ECF No. 47-13, at 37:22–38:4, 46:21–47:14.) Ringel also independently contacted J.J.'s mother on several occasions due to J.J.'s behavior. (Defs.' 56.1, ECF No. 47-2 ¶ 113; *see also, e.g.*, Jan. 30, 2018 Email, ECF No. 47-35.)

Following one of Ringel's complaints about J.J.'s use of religious slurs against him, Dean Haynes met with J.J., J.J.'s mother, and the school guidance counselor. (Defs.' 56.1, ECF No. 47-2, ¶ 112 (citing Haynes Dep., ECF No. 47-34, at 40:20–41:18).) The P.S. 156 administrators also entered multiple reports involving J.J. into the online occurrence reporting system ("OORS") during the 2017–2018 school year. (*See* OORS Reports, ECF Nos. 48-10, 48-13.)[8] Additionally, on January 24, 2018, J.J. was removed from Ringel's classroom for two days on a principal's suspension for being "aggressive to his teachers and peers." (Defs.' 56.1, ECF No. 47-2, ¶ 114; Principal's Suspension Record, ECF No. 47-36.)[9]

---

[8] Incidents at school, including physical altercations between students and allegations of corporal punishment against teachers, are reported on the OORS platform, at which point the DOE Office of Special Investigations ("OSI") makes a determination about further investigation. (Defs.' 56.1, ECF No. 47-2, ¶ 18; Pl.'s 56.1, ECF No. 48-1, ¶¶ 18, 147–52.) The P.S. 156 administration submitted multiple OORS reports in response to J.J.'s behavior during the 2017–2018 school year, including reports that mention J.J.'s threats and name-calling. (*See generally* OORS Reports, ECF Nos. 48-10, 48-13.) However, Ringel states that none explicitly mention "student-on-teacher discrimination[.]" (Pl.'s 56.1, ECF No. 48-1, ¶ 191.)

[9] Ringel does not dispute that J.J. was suspended, but seeks to clarify that J.J. was not suspended "due to his use of religious and racial slurs and epithets against him." (Pl.'s 56.1, ECF No. 48-1, ¶ 114.) Additionally, the Court notes that a principal's suspension is an "in school" suspension that results in the student being sent to a special classroom for up to four days. (Moore-Allen Dep., ECF No. 47-8, at 60:9–17.)

Later in the school year, on March 16, 2018, Ringel emailed Defendant Moore-Allen and AP LaMont-Agard about J.J.'s verbal threat of violence against him. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 261–62; Mar. 16, 2018 Email, ECF No. 48-19.) Then, on March 28, 2018, Ringel exchanged emails with Defendant Moore-Allen regarding J.J.'s continued misconduct toward Ringel and the other students. (Pl.'s 56.1, ECF No. 48-1, ¶ 270; Mar. 28, 2018 Emails, ECF No. 48-20.) Ringel also sent an email to Defendant Moore-Allen and AP LaMont-Agard on April 10, 2018, requesting a meeting to address J.J.'s behavior and language. (Pl.'s 56.1, ECF No. 48-1, ¶ 282; Apr. 10, 2018 Email, ECF No. 48-23.) Ringel sent a follow-up email to them on April 13, 2018, expressing concern about J.J.'s behavior toward students and staff. (Pl.'s 56.1, ECF No. 48-1, ¶ 284; Apr. 13, 2018 Email, ECF No. 48-24.) Additionally, Ringel emailed Defendant Moore-Allen and AP LaMont-Agard on April 17, 2018, to report the incident where J.J. made a shooting motion at him. (Pl.'s 56.1, ECF No. 48-1, ¶ 285; Apr. 17, 2018 Email, ECF No. 48-25.)

On April 19, 2018, following Ringel's filing of a complaint with the NYPD and emailing the school administration about J.J.'s making a shooting motion, a meeting was held with Ringel, J.J., J.J.'s mother, AP LaMont-Agard, Ms. Miller-Bovain, and NYPD Detective Gary Allen. (Defs.' 56.1, ECF No. 47-2, ¶ 116; Pl.'s 56.1, ECF No. 48-1, ¶¶ 116, 290.) Dean Haynes also reported the gun gesture incident in the OORS platform. (Pl.'s 56.1, ECF No. 48-1, ¶ 286; OORS Reports, ECF No. 48-13, at 5–6.) During the meeting, the group discussed the possibility of moving J.J. to another classroom. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 291–92.) However, there were only two fourth grade ICT classrooms at P.S. 156 that year. (Defs.' 56.1, ECF No. 47-2, ¶ 118.) Because J.J. had a prior conflict with a student in the other fourth grade class, the school administration

informed Ringel that J.J. could not be moved into the other classroom. (*Id.* ¶ 119; Pl.'s 56.1, ECF No. 48-1, ¶¶ 119, 201, 301.)[10]

On May 3, 2018, the same day Ringel filed a police report with the NYPD (Pl.'s 56.1, ECF No. 48-1, ¶ 296), he also filed a safety grievance on account of being "disrespected on a regular basis" by J.J. throughout the 2017–2018 school year. (*Id.* ¶ 296; School Safety Complaint Form, ECF No. 48-26.) On May 7, 2018, a second meeting was held with Ringel, Defendant Moore-Allen, Ringel's union representative, and Detective Allen. (Defs.' 56.1, ECF No. 47-2, ¶ 117; Pl.'s 56.1, ECF No. 48-1, ¶¶ 117, 298.) It was again suggested that J.J. be moved to a different classroom. (Pl.'s 56.1, ECF No. 48-1, ¶ 299.) The same day, Ringel emailed Defendant Moore-Allen and AP LaMont-Agard to notify them that J.J. had threatened him with physical violence. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 304–05; May 7, 2018 Email, ECF No. 48-27.) The next day, on May 8, 2018, Ringel submitted a form seeking to have J.J. removed from his classroom. (Pl.'s 56.1, ECF No. 48-1, ¶ 306; Student Removal Form, ECF No. 48-28; Pl.'s Decl., ECF No. 48-3, ¶ 10.) Additionally, following the safety grievance Ringel filed on May 3, 2018 (*see* Pl.'s 56.1, ECF No. 48-1, ¶ 296; School Safety Complaint Form, ECF No. 48-26), Ringel met with Defendant Moore-Allen and was offered a "hardship transfer" to leave the school, but ultimately declined to transfer. (Defs.' 56.1, ECF No. 47-2, ¶ 120 (citing Pl.'s Dep., ECF No. 47-5, at 76:22–77:6); Pl.'s 56.1, ECF No. 48-1, ¶ 120.)[11]

---

[10] Ms. Miller-Bovain also recommended that J.J. be placed in a different class and raised the possibility of the other student J.J. had an issue with being moved back into Ringel's classroom, but stated that Defendant Moore-Allen had rejected the idea. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 119, 199–203; Miller-Bovain Dep., ECF No. 47-13, at 39:16–25, 40:11–23, 41:13–42:5.)

[11] Ringel disputes that Defendant Moore-Allen actually offered the transfer and claims that she did not offer to assist him. (*See* Pl.'s 56.1, ECF No. 48-1, ¶ 120 (citing Pl.'s Dep., ECF No. 47-5, at 118:6–16).) However, at his deposition, Ringel testified that Defendant Moore-Allen "offered . . . . a hardship transfer" and he "turned it down because [he] didn't believe that [he] should have to run away from the issue." (Pl.'s Dep., ECF No. 47-5, at 76:25–77:3.)

#### D. Ringel's Disciplinary History

As the situation involving J.J. worsened, Ringel was the subject of multiple corporal punishment and misconduct investigations pertaining to J.J. and other students, as well as an incident involving Ringel losing a pet snake at the school.

##### 1. Corporal Punishment Investigations

###### a) *Corporal Punishment Allegations as to J.J.*

###### i. *OSI File 17-10706X*

On December 12, 2017, the school submitted a corporal punishment intake form to the Office of Special Investigations (the "OSI") based on J.J.'s accusation that Ringel had pushed him out of the room. (Defs.' 56.1, ECF No. 47-2, ¶ 23; Dec. 12, 2017 OSI Intake Form, ECF No. 47-10.) Ringel denied this accusation and stated that he took J.J. "by the hand" and escorted him out of the classroom. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 28, 216.) On February 12, 2018, Ringel was reassigned from P.S. 156 for two weeks because OSI was investigating his actions. (Defs.' 56.1, ECF No. 47-2, ¶¶ 24–25.) On February 14, 2018, AP LaMont-Agard met with Ringel and his union representative, and informed him of the allegation that Ringel had "pushed Student A, pulled Student A out of the classroom, and hit and/or pretended to hit Student A, causing Ms. Walker to hold you away and/or back from Student A." (Defs.' 56.1, ECF No. 47-2, ¶¶ 31–32.)[12]

Following her investigation, AP LaMont-Agard substantiated the allegation of corporal punishment against Ringel and summarized her findings in a March 8, 2018 letter, warning Ringel that "these incidents may lead to further disciplinary action[.]" (Defs.' 56.1, ECF No. 47-2, ¶¶ 26–27, 35; Mar. 8, 2018 Letter to File, ECF No. 47-14.)

---

[12] Ringel disputes that he was "informed of a specific allegation," but does not dispute that this meeting took place or that it concerned the allegations of corporal punishment referenced above. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 31–32, 234.) In addition, the Court notes that, in context, "Student A" to refers to J.J. (*See id.* ¶ 47; Pl.'s Mem., ECF No. 48, at 27–28.)

Specifically, AP LaMont-Agard concluded that Ringel used unreasonable force against J.J. and therefore engaged in professional misconduct and corporal punishment in violation of Chancellor's Regulation A-420. (*Id.* ¶¶ 29, 33–34; P.S. 156 Handbook, ECF No. 47-15, at 8.)[13] Ringel disputed the sufficiency of AP LaMont-Agard's investigation, the conclusion that he removed J.J. from the classroom in an unreasonable fashion, and that the March 8, 2018 letter was "supposed to be placed in his file." (Pl.'s 56.1, ECF No. 48-1, ¶¶ 27, 29, 35, 241–60; Pl.'s Resp. to Mar. 8, 2018 Letter to File, ECF No. 48-18.)

ii. *OSI File 18-01138X*

On February 2, 2018, AP LaMont-Agard responded to a separate allegation that Ringel pushed J.J. out of the classroom and that J.J. pushed him back. (Defs.' 56.1, ECF No. 47-2, ¶ 44; Feb. 2, 2018 OSI Intake Form, ECF No. 48-32.) On February 26, 2018, Defendant Moore-Allen met with Ringel and his union representative concerning her investigation into the allegation that Ringel "pushed and grabbed Student A." (Defs.' 56.1, ECF No. 47-2, ¶¶ 45–46.) Following an investigation, Defendant Moore-Allen substantiated the allegation of corporal punishment and summarized her findings in an April 9, 2018 letter, warning that "these incidents may lead to further disciplinary action[.]" (*Id.* ¶¶ 47–48; Apr. 9, 2018 Letter to File, ECF No. 47-19.) Ringel denied this allegation and disputed the sufficiency of the witness statements relied on by Defendants. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 47, 237, 274–76; Pl.'s Resp. to Apr. 9, 2018 Letter to File, ECF No. 48-21.)

---

[13] Ringel's co-teacher, Ms. Walker, also stated that she witnessed confrontations between Ringel and J.J., and in one instance had to physically get between them. (*See* Walker Dep., ECF No. 47-27, at 25:11–15, 27:3–5, 35:8–20.)

### iii. *OSI File 18-01287X*

On February 6, 2018, AP LaMont-Agard submitted a third corporal punishment

intake form to the OSI based on an allegation that J.J. and Ringel had pushed each other

the day before. (Defs.' 56.1, ECF No. 47-2, ¶ 49; Feb. 6, 2018 OSI Intake Form, ECF No.

47-20.) Following an investigation, which included nine student interviews, AP

LaMont-Agard met with Ringel and his union representative on April 30, 2018, and

informed Ringel that she had substantiated the allegation of corporal punishment

against him. (Defs.' 56.1, ECF No. 47-2, ¶¶ 49–53.) AP LaMont-Agard summarized her

findings in a May 8, 2018 letter, warning that "this incident may lead to further

disciplinary action[.]" (*Id.* ¶ 54; May 8, 2018 Letter to File, ECF No. 47-21.)[14] Ringel

denied that he engaged in corporal punishment and disputed the completeness of this

investigation as well as the timeliness of the May 8, 2018 letter. (Pl.'s 56.1, ECF No. 48-1,

¶¶ 49–51, 54, 324–27; Pl.'s Resp. to May 8, 2018 Letter to File, ECF No. 48-30; Contract

Grievance Decision, ECF No. 48-7.)

### b) *Corporal Punishment Allegations as to Other Students*[15]

### i. *OSI File 18-01518X*

On February 9, 2018, AP LaMont-Agard submitted a corporal punishment intake

form concerning a different student's allegation that Ringel "grabbed him by his arms

and threw him out of the classroom," and then "followed the student, caught [the

---

[14] AP LaMont-Agard stated that the delay in this investigation and subsequent letter was due to the general volume of investigations being conducted by the school administration. (Defs.' 56.1, ECF No. 47-2, ¶ 76; Pl.'s 56.1, ECF No. 48-1, ¶¶ 76, 323; Deposition of Ayesha LaMont-Agard ("LaMont-Agard Dep."), ECF No. 47-12, at 98:22–99:13.)

[15] In addition to the investigations summarized below, Ms. Walker, Ringel's co-teacher, stated that she observed Ringel engaging in inappropriate physical acts toward multiple students other than J.J., which Ringel disputes. (*See* Defs.' 56.1, ECF No. 47-2, ¶ 71 (citing Walker Dep., ECF No. 47-27, at 27:21–28:9, 31:3–10); Pl.'s 56.1, ECF No. 48-1, ¶ 71.)

student] by his hood breaking the zipper of his hoodie and dragged him down the stairs as his leg hit the stairs." (Defs.' 56.1, ECF No. 47-2, ¶ 55.) The student also claimed that Ringel "held him by his arms in the corner of the stairwell and yelled in his face." (*Id.*) The police were contacted and EMS took the student to the hospital. (*Id.*; Feb. 9, 2018 OSI Intake Form, ECF No. 48-33.) AP LaMont-Agard interviewed ten students and Ringel as part of her investigation into this allegation and concluded that Ringel engaged in corporal punishment in violation of Chancellor's Regulation A-420. (Defs.' 56.1, ECF No. 47-2, ¶¶ 56, 59.) Ringel denied that his use of force was unreasonable and claimed that the student was attempting to stab other students with pencils. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 59, 220.)[16] AP LaMont-Agard summarized her findings in an April 9, 2018 letter, warning that "this incident may lead to further disciplinary action[.]" (Defs.' 56.1, ECF No. 47-2, ¶ 60; Apr. 9, 2018 Letter to File, ECF No. 47-23.)

ii.    *OSI File 18-05653X*

On May 23, 2018, Defendant Moore-Allen submitted a corporal punishment intake form concerning a female student's complaint that Ringel grabbed her by the arm, noting that the "[s]tudent was crying and her arm was red." (Defs.' 56.1, ECF No. 47-2, ¶ 61; May 23, 2018 OSI Intake Form, ECF No. 47-24.) The school investigated the incident and AP LaMont-Agard concluded that Ringel committed both verbal and physical corporal punishment. (Defs.' 56.1, ECF No. 47-2, ¶¶ 62, 65.) AP LaMont-Agard attempted to meet with Ringel concerning this allegation, but Ringel did not appear for a meeting. (*Id.* ¶¶ 63–64; Oct. 2, 2019 Letter, ECF No. 47-25.) Ringel denies this accusation of corporal punishment, and notes that the investigation was not conducted

---

[16] Ringel notes that he met with AP LaMont-Agard regarding this incident on March 28, 2018, and that he stated during the meeting that he escorted the student out of the classroom because he was concerned for the safety of his students and himself. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 266–68; Pl.'s Notebook, ECF No. 48-6, at 14–16.)

until June 2019, and that AP LaMont-Agard's attempts to meet with Ringel occurred after his discontinuance. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 62–65.)

### iii. *OSI File 18-06624X*

On June 13, 2018, the school submitted a corporal punishment intake form regarding a June 8, 2018 incident in which a female student reported that Ringel "grabbed her by the arm really hard and push[ed] her out of the classroom," and that "her foot caught in the door and he continued to push the door" until another adult intervened. (Defs.' 56.1, ECF No. 47-2, ¶¶ 66, 69; June 13, 2018 OSI Intake Form, ECF No. 47-26.) Following an investigation, Ringel was informed that AP LaMont-Agard had substantiated this corporal punishment allegation against him. (Defs.' 56.1, ECF No. 47-2, ¶¶ 67, 70.) AP LaMont-Agard also attempted to meet with Ringel concerning this allegation, but Ringel did not appear for a meeting. (*Id.* ¶ 68.) Ringel denies this accusation of corporal punishment, and again notes that the investigation was not conducted until May 2019, and that AP LaMont-Agard's attempts to meet with Ringel occurred after his discontinuance. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 67–68, 70; *see also* Defs.' 56.1, ECF No. 47-2, ¶ 127.)

### 2. Pet Snake Incident (OSI File 18-00896X)

On January 23, 2018, AP LaMont-Agard contacted the Special Commission of Investigation ("SCI") to report that Ringel had lost a pet garden snake and did not report that the snake was missing. (Defs.' 56.1, ECF No. 47-2, ¶ 36.) AP LaMont-Agard also contacted the NYPD. (*Id.* ¶ 37.) Following an investigation, Defendant Moore-Allen held a meeting with Ringel and his union representative on March 27, 2018. (*Id.* ¶¶ 38–39.) At the meeting, Defendant Moore-Allen informed Ringel that she had concluded Ringel engaged in professional misconduct by failing to ask for permission to bring the snake to school and by failing to inform an administrator once it had gone missing. (*Id.*

¶¶ 40–42.)[17] Defendant Moore-Allen summarized her findings in a May 8, 2018 letter, warning that "this incident may lead to further disciplinary action[.]" (*Id.* ¶ 43; May 8, 2018 Letter to File, ECF No. 47-17.)[18]

### E. Protected Activity

As the situation with J.J. was escalating and the misconduct complaints against Ringel were unfolding, he also engaged in formal protected activity under Title VII, as well as the NYSHRL and NYCHRL.

#### 1. OEO Complaint

On March 29, 2018, Ringel made an online complaint to the DOE Office of Equal Opportunity ("OEO"), accusing Defendant Moore-Allen and AP LaMont-Agard of race and religion-based discrimination for failing to address his complaints regarding J.J., as well as retaliation for falsely accusing Ringel of corporal punishment and issuing him negative classroom observation ratings. (Defs.' 56.1, ECF No. 47-2, ¶¶ 121–22; Mar. 29, 2018 OEO Complaint, ECF No. 47-37.) Ringel was interviewed regarding his complaint,[19] and on April 26, 2018, an OEO investigator referred his complaint to Defendant Pate's office, noting that Ringel "could not articulate that Principal Moore

---

[17] While Ringel does not dispute this sequence of events, he does dispute the finding that his actions constituted misconduct and that the related letter to file was validly issued. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 41, 43, 265, 310–21; Pl.'s Resp. to May 8, 2018 Letter to File, ECF No. 48-29; *see also* Defs.' 56.1, No. 47-2, ¶ 129; Contract Grievance Decision, ECF No. 48-7.) Specifically, he claims that the snake was in his classroom from the beginning of the 2017–2018 school year and that the school administration knew it was there. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 312–15.)

[18] Ringel also received a May 9, 2017 letter to file from P.S. 195 Assistant Principal Desiree LaFontaine for acting "in an unprofessional manner" during a planning and development session. (Defs.' 56.1, ECF No. 47-2, ¶ 9; May 9, 2017 Letter to File, ECF No. 47-7.) Ringel does not dispute receiving this letter but notes he filed a rebuttal letter. (Pl.'s 56.1, ECF No. 48-1, ¶ 9; Pl.'s Resp. to May 9, 2017 Letter to File, ECF No. 48-4.)

[19] Ringel appears to dispute that he was "interviewed," but notes that he received a follow-up call from the OEO regarding his complaint. (Pl.'s 56.1, ECF No. 48-1, ¶ 123; Pl.'s Dep., ECF No. 47-5, at 101:5–10.)

and AP Lamont's actions were discriminatory" or "retaliatory," and that Ringel had "acknowledged alternative reasons for his negative treatment." (Defs.' 56.1, ECF No. 47-2, ¶¶ 123–24; OEO Emails, ECF No. 47-38.)[20] On May 3, 2018, Ringel met with Defendant Pate to address his complaints about the P.S. 156 administration's inaction in response to J.J.'s behavior, and Defendant Pate agreed to visit Ringel's classroom. (Defs.' 56.1, ECF No. 47-2, ¶ 125.)

### 2. Grievances

In addition to the OEO complaint, in April 2018, Ringel filed four grievances through his union contesting three letters to his file, which substantiated allegations of corporal punishment, and one requesting witness statements. (*Id.* ¶ 127.) Defendant Moore-Allen provided Ringel with the requested witness statements and denied Ringel's grievances related to the three letters. (*Id.* ¶ 128.) In addition, Ringel filed a grievance regarding the letter to file following the snake incident, and that letter was later removed from his file. (*Id.* ¶ 129.)

### F. September 27, 2018 Encounter Between Ringel and Defendant Moore-Allen

On September 27, 2018, one week before Defendant Pate affirmed Ringel's discontinuance, he went to P.S. 156 to review his personnel file. (*Id.* ¶¶ 130–31.) What happened that day forms the basis of Ringel's § 1983 claim alleging false arrest. While in Defendant Moore-Allen's office, Ringel attempted to remove a copy of a retainer agreement with his attorney that had ended up in his file, but Defendant Moore-Allen indicated that he was not allowed to leave until he returned the document, as anything

---

[20] Ringel does not dispute the authenticity of this email, but denies that he was "unable to articulate" why the school administration's actions were "discriminatory and retaliatory," or that he cited "alternative reasons" for his negative treatment. (Pl.'s 56., ECF No. 48-1, ¶ 124.) Notably, Ringel does acknowledge that Defendants themselves never made comments about his religion or used any slurs against him. (*Id.* ¶ 126.)

in his file was DOE property. (*Id.* ¶¶ 133–36; Pl.'s 56.1, ECF No. 48-1, ¶¶ 133–36.) Ringel

then attempted to leave with the document and was stopped by school safety agents.

(Defs.' 56.1, ECF No. 47-2, ¶ 135.) After calling his attorney and returning the document

to his file, Ringel was allowed to leave. (*Id.* ¶ 136; Pl.'s 56.1, ECF No. 48-1, ¶¶ 136, 338;

Pl.'s Dep., ECF No. 47-5, at 94:9–22.)

## II.    Procedural History

Ringel commenced this action on April 23, 2019. (Compl., ECF No. 1.) On

September 28, 2020, following the close of discovery (*see* Sept. 16, 2020 ECF Minute

Entry), Defendants filed a motion for a pre-motion conference in anticipation of filing a

motion for summary judgment (Mot. for Pre-Mot. Conference, ECF No. 36). On October

16, 2020, the Honorable Eric N. Vitaliano approved the parties' proposed briefing

schedule. (Oct. 16, 2020 ECF Order.) The case was then reassigned to Judge Gujarati on

December 11, 2020, and Defendants' motion was fully briefed as of May 14, 2021. (*See*

Defs.' Mot., ECF No. 47.) On October 28, 2021, Judge Gujarati referred Defendants'

motion to the undersigned Magistrate Judge for a report and recommendation. (Oct. 28,

2021 ECF Order.)

### DISCUSSION

## I.    Legal Standards

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*

*also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d

Cir. 2017). "A fact is 'material' for these purposes if it 'might affect the outcome of the

suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "genuine" if

"'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021) (alterations and quotation marks omitted).

The movant "'bears the burden of demonstrat[ing] the absence of a genuine issue of material fact.'" *Nick's Garage, Inc.*, 875 F.3d at 114 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). In cases where the non-movant bears the burden of proof at trial, "the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim." *Tardif v. City of New York*, 991 F.3d 394, 403 (2d Cir. 2021) (citing *Celotex Corp.*, 477 U.S. at 325). Once the moving party has satisfied their burden, "'the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 51 (E.D.N.Y. 2021) (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). However, summary judgment must be denied "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Further, Rule 56(c) provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

> other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c); *Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 274 (E.D.N.Y. 2014).

When determining whether a movant is entitled to summary judgment, judges do not weigh the evidence or make credibility determinations to decide the truth of the matter, but instead determine "whether there is a genuine issue for trial." *Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) (citing *Anderson*, 477 U.S. at 249, 255). District courts are "required to 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). In addition, courts "may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020).

For summary judgment motions arising in discrimination cases, the Second Circuit has warned that "an extra measure of caution is merited . . . because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)); *see also Lener*, 55 F. Supp. 3d at 274–75. "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Berger-Rothberg v. City of New York*, 803 F. Supp. 2d 155, 163 (E.D.N.Y. 2011).

## II. Analysis

Ringel brings claims under Title VII, the NYSHRL, and the NYCHRL, alleging mistreatment due to his religion (Judaism) and race (White). (Am. Compl., ECF No. 21, ¶ 1.) Ringel alleges that Defendants discriminated and retaliated against him by (1) creating a hostile work environment in failing to take proper remedial action against J.J.; and (2) issuing him disciplinary letters, giving him poor performance reviews, substantiating false allegations of misconduct against him, and discontinuing his employment. (*Id.* ¶¶ 55–72.) Additionally, Ringel claims that he was falsely arrested and imprisoned in Defendant Moore-Allen's office on September 27, 2018. (*Id.* ¶¶ 73–76.)

Defendants argue they are entitled to summary judgment on Ringel's hostile work environment claims because, based on the record before the Court, no jury could reasonably find that Ringel suffered severe or pervasive student-on-teacher harassment due to his religion or race, and because Defendants took adequate responses to Ringel's complaints. (Defs.' Mem., ECF No. 47-1, at 9–15, 17–19; Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply"), ECF No. 49, at 3–7.) Defendants also argue that Ringel cannot establish a causal connection between his protected activity and any of the alleged adverse employment actions he suffered, and therefore, summary judgment should be granted as to Ringel's retaliation claims. (Defs.' Mem., ECF No. 47-1, at 19–25; Defs.' Reply, ECF No. 49, at 8–10.) Further, Defendants assert that Ringel has abandoned any "non-hostile work environment discrimination" claims. (Defs.' Reply, ECF No. 49, at 2.) And lastly, Defendants contend that summary judgment should be granted as to Ringel's § 1983 claim because there was probable cause to detain Ringel and Defendant Moore-Allen is entitled to qualified immunity. (Defs.' Mem., ECF No. 47-1, at 25–27; Defs.' Reply, ECF No. 49, at 10.)

In response, Ringel argues that there are genuine issues for trial as to (1) whether he was subjected to an objectively hostile work environment and whether Defendants took appropriate action following his complaints of J.J.'s harassment; and (2) whether Defendants' retaliatory motives caused the aforementioned letters to file and the decision to discontinue his probationary employment. (*See generally* Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s Mem."), ECF No. 48.) Additionally, in support of his § 1983 claim, Ringel argues that the school safety agents who prevented him from leaving Defendant Moore-Allen's office on September 27, 2018, were following her orders and that she is not entitled to qualified immunity. (*Id.* at 34–36.)

For the reasons set forth below, the Court respectfully recommends that summary judgment be denied as to Ringel's hostile work environment and retaliation claims, and that summary judgment be granted as to Ringel's claim of discrimination under Title VII and New York law, to the extent he is making one, and as to his § 1983 claim.

**A. Ringel's Hostile Work Environment Claims**

1. Title VII/NYSHRL Claims

The standard for showing a hostile work environment under Title VII and the NYSHRL are essentially identical, and therefore these claims will be analyzed together. *See Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 479 (S.D.N.Y. 2017); *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011).

 a) *Applicable Law*

Title VII is violated when, due to an employees' race, religion, sex, or national origin, "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and quotation marks omitted); *see also Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015). This standard contains both objective and subjective components. First, "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive," and second, "the victim must subjectively perceive the work environment to be abusive." *Rasprado v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22; *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *see also Schiano*, 445 F.3d at 604–05. In conducting this analysis, "courts . . . 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (alterations in original) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).

The incidents in question "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Rasprado*, 770 F.3d at 114. However, "[t]here is no mathematically precise test . . . for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment." *Id.* (quotation marks omitted). Notably, the Second Circuit has observed that even though "the standard for establishing a hostile work environment is high . . . . [t]he environment need not be 'unendurable' or 'intolerable.'" *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)); *see also id.* ("[T]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free

from liability in all but the most egregious cases."); *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 335 (E.D.N.Y. 2015).

In addition, to succeed on a hostile work environment claim under Title VII or the NYSHRL, "the plaintiff must show that 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d at 452 (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir. 2004)). The Second Circuit has yet to squarely address whether "student-on-teacher harassment can give rise to a hostile work environment claim." *Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 190 (2d Cir. 2010) (summary order). However, district courts in this circuit have generally required plaintiffs alleging such claims to show that (1) a hostile environment existed; and (2) the school either "provided no reasonable avenue of complaint or knew of the harassment and failed to take appropriate remedial action." *Berger-Rothberg*, 803 F. Supp. 2d at 164–65 (citing *Peries v. New York City Bd. of Educ.*, No. 97-CV-7109 (ARR), 2001 WL 1328921, at *6 (E.D.N.Y. Aug. 6, 2001)); *see also Karunakaran v. Borough of Manhattan Cmty. Coll.*, No. 18-CV-10723 (ER), 2021 WL 535490, at *7 (S.D.N.Y. Feb. 12, 2021); *Eubanks v. New York City Dep't of Educ.*, No. 18-CV-7877 (LJL) (SLC), 2021 WL 1110587, at *18 (S.D.N.Y. Feb. 3, 2021), *report and recommendation adopted*, No. 18-CV-7877 (LJL), 2021 WL 1105065 (S.D.N.Y. Mar. 23, 2021).

Courts within this circuit have "cautioned [that] the existence of a hostile work environment is a mixed question of law and fact which is especially well-suited for jury determination and summary judgment may only be granted when reasonable minds could not differ on the issue." *Geras*, 149 F. Supp. 3d at 335 (alteration in original) (citing *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 458 (S.D.N.Y. 2013), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (summary order)).

b) *Analysis*

Defendants argue that J.J.'s conduct is insufficient to sustain a hostile work environment claim because it was not objectively severe or pervasive. (Defs.' Mem., ECF No. 47-1, at 11–14.)[21] Furthermore, Defendants contend that they took sufficient remedial actions. (*Id.* at 14–15.) In response, Ringel asserts that over a seven-month period, he "suffered repeated, racially and religiously charged slurs and epithets, combined with acts of violence and death threats," and that Defendants ignored his pleas for help. (Pl.'s Mem., ECF No. 48, at 8, 9–18.) For the reasons below, the Court finds that Ringel has shown that questions of fact exist as to his hostile work environment claims that preclude a grant of summary judgment. The Court therefore respectfully recommends that Defendants' motion be denied as to Ringel's Title VII and NYSHRL hostile work environment claims.

i. *Objectively Hostile*

Defendants raise several arguments in support of their contention that no reasonable jury could conclude Ringel endured an objectively hostile work environment. For example, they argue that Ringel cannot show that J.J. targeted him on account of his race or religion because J.J. acted just as inappropriately toward other students and staff. (Defs.' Mem., ECF No. 47-1, at 11–12; Defs.' Reply, ECF No. 49, at 3–5.) Additionally, they assert that the complained-of harassment does not rise to the level of "severe or pervasive" and that Ringel has failed to establish that a "reasonable special education teacher" would have considered J.J.'s behavior severe. (Defs.' Mem., ECF No. 47-1, at 12–14; Defs.' Reply, ECF No. 49, at 5–7.)

---

[21] Defendants do not appear to dispute that Ringel subjectively perceived his work environment to be hostile. (*See generally* Defs.' Mem., ECF No. 47-1; Defs.' Reply, ECF No. 49.)

As to the first point, the fact that J.J.'s behavioral outbursts affected other students and staff, including Ringel's co-teacher (*see* Defs.' 56.1, ECF No. 47-2, ¶¶ 105–07), does not necessarily undermine Ringel's claim that J.J. created an objectively hostile work environment *for him*. Furthermore, Ringel argues that he experienced a different caliber of harassment as compared to the other staff. Indeed, the record reflects several incidents spanning the school year in which J.J. directed expressly religious epithets at Ringel, including calling him a "fucking Jew," a "bitch ass Jew," and a "fucking stinky Jew." (*See* Pl.'s 56.1, ECF No. 48-1, ¶¶ 209–10, 213, 216, 218, 282; Defs.' 56.1, ECF No. 47-2, ¶¶ 103–04.) Ringel kept a journal of these events (*see generally* Pl.'s Notebook, ECF No. 48-6), and at least some of the incidents were witnessed and corroborated by Ms. Miller-Bovain, the school guidance counselor. (Pl.'s 56.1, ECF No. 48-1, ¶ 188.) Additionally, the record shows that there were physical altercations between J.J. and Ringel, and that J.J. made physical threats against Ringel. (*Id.* ¶¶ 209–10, 261, 282, 285, 296, 304–05; Defs.' 56.1, ECF No. 47-2, ¶ 115.)[22]

Defendants also argue that because it was just one behaviorally challenged student harassing Ringel, instead of a classroom of students, as in *Berger-Rothberg*, *Peries*, and *Eubanks*, Ringel's claims must fail. This argument is unavailing. Given the specific and detailed allegations of J.J.'s behavior, the Court finds that J.J.'s conduct was of a kind that a jury could reasonably conclude created a hostile work environment. This was not a one-off isolated incident or limited offensive utterances. Rather, as discussed above, this was a school year marked by name-calling, physical altercations,

---

[22] The Court does not find that the record evidence unequivocally substantiates Ringel's description of J.J.'s making a gun motion at him and stating that he wished Ringel were dead to constitute "death threats." (*See* Pl.'s 56.1, ECF No. 48-1, at ¶¶ 285–87, 296–97.) However, given the circumstances in this case, including J.J.'s age and the history that had developed between Ringel and J.J. by the spring of 2018, and resolving all ambiguities in favor of Ringel, the Court finds that a reasonable jury could find these actions constituted threats of violence.

and threats that a reasonable jury could find "constituted a series of incidents 'sufficiently continuous and concerted in order to be deemed pervasive[.]'" *Berger-Rothberg*, 803 F. Supp. 2d at 165 (alterations in original) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

Defendants also cite to several district court cases from around the country to argue that Ringel's experience falls short of the "objective" prong of a hostile work environment claim. (*See* Defs.' Mem., ECF No. 48, at 11–14; Defs.' Reply, ECF No. 49, at 3–7 (citing, *inter alia*, *Webster v. Chesterfield Cty. Sch. Bd.*, 534 F. Supp. 3d 537 (E.D. Va. 2021); *Gaddis v. Alabama Inst. for Deaf & Blind*, No. 16-CV-1881 (SGC), 2019 WL 4393025, at *1 (N.D. Ala. Sept. 13, 2019); *Dennis v. Caddo Par. Sch. Bd.*, No. 09-CV-1094, 2011 WL 3117864, at *1 (W.D. La. July 26, 2011*); *Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467 (D. Del. 2007)).) Each of these cases, however, are distinguishable from the present case.[23] Moreover, as Defendants concede, there is no articulated standard in this circuit for what a special education teacher must demonstrate to establish an objectively severe hostile work environment. (*See* Defs.' Mem., ECF No. 48, at 13.)

In the Court's view, the totality of the circumstances here, including the frequency of J.J.'s conduct, its relative severity and escalating character, and how it interfered with Ringel's job, could lead a reasonable jury to find that Ringel's classroom

---

[23] For example, unlike in this case, the plaintiff in *Gaddis* did not allege how often the student used racial epithets or insults, or even what specific statements the student made, and the student's harassment occurred over a slightly shorter duration than the alleged conduct here. *Gaddis*, 2019 WL 4393025, at *16. In *Mongelli*, the complained-of harassment occurred over a span of ten school days. *Mongelli*, 491 F. Supp. 2d at 480. And in *Webster* and *Dennis*, the record contained much more evidence of the harassing students' disabilities. *Webster*, 534 F. Supp. 3d at 546–47; *Dennis*, 2011 WL 3117864, at *3. Furthermore, in *Das*, the Second Circuit noted that the record only revealed "episodic, isolated incidents of ethnically — or racially-motivated student-on-teacher harassment, spread over the three years of her employment . . . ." *Das*, 369 F. App'x at 190.

was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment[.]" *Harris*, 510 U.S. at 21 (citation and quotation marks omitted); *Littlejohn*, 795 F.3d at 320–21; *see also Lall v. City of New York*, No. 17-CV-3609 (WFK) (LB), 2021 WL 848851, at *10 (E.D.N.Y. Mar. 5, 2021). The Court also finds that Ringel has identified genuine and material factual issues in dispute, as well as evidentiary support in the record for this claim. *See Berger-Rothberg*, 803 F. Supp. 2d at 165 ("Plaintiff has produced sufficient evidence for summary judgment purposes to show that []he experienced a hostile work environment on the basis of race . . . and religion."); *see also Rivera*, 743 F.3d at 20–23; *Schiano*, 445 F.3d at 608; *Eubanks*, 2021 WL 1110587, at *18; *Geras*, 149 F. Supp. 3d at 336–37; *Peries*, 2001 WL 1328921, at *6.

Framed another way, reasonable minds could differ as to whether J.J.'s actions were motivated by racial and religious animus, and whether Ringel's work environment was sufficiently hostile so as to impact the conditions of his employment. Accordingly, "[w]hile the jury might not in the end be convinced by [Ringel]'s allegations, this inquiry cannot be resolved conclusively on summary judgment." *Peries*, 2001 WL 1328921, at *6.

ii.    *Remedial Actions*

As to the adequacy of Defendants' response to Ringel's complaints about J.J., the Court similarly finds that this inquiry cannot be resolved conclusively because there are disputed issues of material fact. On the one hand, the record clearly reflects that Defendants responded to J.J.'s behavior. School administrators held meetings with Ringel, J.J., J.J.'s guardian, the school guidance counselor, and other members of the P.S. 156 administration; entered OORS reports in response to J.J.'s conduct; and suspended J.J. from Ringel's class for two days. (Defs.' 56.1, ECF No. 47-2, ¶¶ 109–14, 116–17; Pl.'s

56.1, ECF No. 48-1, ¶¶ 109–14, 116–17, 194, 263, 270, 286; *see also* OORS Reports, ECF Nos. 48-10, 48-13.) Defendants also discussed the possibility of moving J.J. to another classroom and offered Ringel a hardship transfer at the end of the school year. (Defs.' 56.1, ECF No. 47-2, ¶¶ 118–20; Pl.'s 56.1, ECF No. 48-1, ¶¶ 118–20, 201, 291–92, 299, 301.) Therefore, Ringel's argument that the school failed to act reasonably following his complaints about J.J.'s harassment and threats of violence is a closer call. (Pl.'s Mem., ECF No. 48, at 12–18.)[24]

However, whether Defendants did "enough" to curb J.J.'s harassment, particularly during the second half of the 2017–2018 school year as Ringel's complaints about J.J. grew more frequent and serious, remains a genuine dispute of fact. (*See* Defs.' Mem., ECF No. 47-1, at 14–15; Defs.' Reply, ECF No. 49, at 7; Pl.'s Mem., ECF No. 48, at 12–18.) Consequently, this issue cannot be resolved on summary judgment, because "'[t]he question of whether school officials took appropriate remedial action is a question of fact, not law.'" *Berger-Rothberg*, 803 F. Supp. 2d at 165 (quoting *Peries*, 2001 WL 1328921, at *7); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) ("[W]e have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate."); *Eubanks*, 2021 WL 1110587, at *19.[25]

---

[24] Ringel also argues that Defendants "did not provide a reasonable avenue for complaint." (Pl.'s Mem., ECF No. 48, at 12, 17–18.) Given the myriad ways in which Ringel lodged complaints about J.J. during the 2017–2018 school year, the Court finds this argument unpersuasive. However, because the Court concludes that Ringel has raised a genuine issue of material fact as to the adequacy of Defendants' remedial actions, that is a sufficient basis for Ringel to establish the second prong of a hostile work environment claim in the student-on-teacher harassment context. *Berger-Rothberg*, 803 F. Supp. 2d at 165.

[25] The record evidence in support of this finding does not come solely from Ringel. For example, the majority of the DOE Chancellor's Committee that reviewed Ringel's discontinuance found the school administration to be "lacking in aggression in removing

For the foregoing reasons, the Court finds that genuine issues of fact regarding the adequacy of Defendants' remedial actions preclude summary judgment.[26] Therefore, the Court respectfully recommends that Defendants' motion for summary judgment be denied as to Ringel's hostile work environment claims under Title VII and the NYSHRL. *See Rivera*, 743 F.3d at 23–24; *Schiano*, 445 F.3d at 608.

2.  NYCHRL Claim

Courts analyze NYCHRL claims "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Under the NYCHRL, plaintiffs "need not establish severe and pervasive conduct to establish liability, so long as the behavior complained of is worse than petty slights and trivial inconveniences." *Adams v. City of New York*, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011) (quotation marks omitted). Because courts addressing NYCHRL claims "take an analytical approach that closely parallels the analysis used for corresponding Title VII claims," the Court respectfully recommends denying summary judgment as to Ringel's NYCHRL hostile work environment claim as well, because it involves the same disputed factual issues that form Ringel's federal and state law claims. *Berger-Rothberg*, 803 F. Supp. 2d at 165 n.5 (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000)); *see also Eubanks*, 2021 WL 1110587, at *19.

---

Student A from [Ringel]'s classroom, despite the behaviors exhibited by Student A during the 2017–2018 School Year that generated the number of recorded A-420 violations." (May 10, 2019 DOE Mem., ECF No. 47-9, at 4.) The Court notes that, in context, "Student A" refers to J.J. (Pl.'s 56.1, ECF No. 48-1, ¶ 335.) In addition, as noted above, Ms. Miller-Bovain also thought J.J. should be placed in a different class, but stated that Defendant Moore-Allen had rejected the idea. (*See* Miller-Bovain Dep., ECF No. 47-13, at 39:16–40:23, 41:13–42:5.) Which is all to say, there is a genuine issue for trial on this subject.

[26] The Court is mindful that Defendants were not required to provide Ringel with the remedial recourse he desired, i.e., responding to each and every one of his emails with a formal investigation, or transferring J.J. out of his classroom. *See Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000).

**B. Ringel's Retaliation Claims**

    1. Title VII/NYSHRL Claims

Claims of retaliation under Title VII and the NYSHRL are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

    a) *Applicable Law*

To establish a prima facie case of retaliation, a plaintiff "must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 316 (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). The burden of proof at this stage is "*de minimis* . . . but it is not non-existent." *Hoag*, 279 F. Supp. 3d at 485 (citations omitted).

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845. After "an employer offers such proof, the presumption of retaliation dissipates[.]" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). At that point, the plaintiff "must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor . . . ." *Zann Kwan*, 737 F.3d at 845; *see also Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015). Put another way, "[i]f the employer produces evidence of a non-retaliatory justification for the adverse employment action, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is pretext for retaliation." *Hoag*, 279 F. Supp. 3d at 485.

b) *Analysis*

Defendants argue that Ringel cannot show a causal connection between his protected activity and any adverse employment action, and that Defendants had legitimate, non-retaliatory reasons to discontinue Ringel that he cannot overcome with a showing of pretext. (Defs.' Mem., ECF No. 47-1, at 20–24; Defs.' Reply, ECF No. 49, 8–10.) Ringel contends that there is a genuine dispute as to whether Defendants' non-retaliatory reasons for his discontinuance, and for issuing him letters to file, were truly legitimate. (Pl.'s Mem., ECF No. 48, at 19–33.)

For the reasons set forth below, the Court finds that the evidence in the record, when construed in a light most favorable to Ringel, *see Kessler*, 461 F.3d at 206, is sufficient to raise genuine issues of fact regarding whether retaliatory motivations contributed to Ringel's alleged adverse employment actions. The Court therefore respectfully recommends that Defendants' motion be denied as to Ringel's Title VII and NYSHRL retaliation claims.

i. *Prima Facie Case*

<u>Protected Activity</u>

"Protected activity is a formal or informal complaint about employment practices or conditions that is motivated by a 'good faith, reasonable belief that the underlying employment practice was unlawful,' even if the practices or conditions were not actually unlawful." *Eubanks*, 2021 WL 1110587, at *14 (quoting *Rivera*, 743 F.3d at 24); *see also Amin v. Akzo Nobel Chems., Inc.*, 282 F. App'x 958, 961 (2d Cir. 2008) (summary order). "However, while such complaints may be informal, they cannot be so vague or 'generalized' that the employer could not 'reasonably have understood [ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" *Bowen-Hooks v.*

*City of New York*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).

There is no dispute that by filing a complaint with the OEO on March 29, 2018, and filing grievances through his union on or about April 20, 2018, that Ringel participated in protected activity that Defendants knew about. (Defs.' 56.1, ECF No. 47-2, ¶¶ 121, 127, 129.) However, Ringel contends that he first engaged in protected activity in November 2017, when he verbally reported to Defendant Moore-Allen that J.J. had called him a "fucking Jew" during the fire drill incident, and that he continued to engage in protected activity throughout the school year. (*See* Pl.'s Mem., ECF No. 48, at 19–22.) For example, Ringel asserts he sent an email to Dean Haynes after the December 12, 2017 incident, during which J.J. called Ringel a "stinky ass n*****" and a "fucking stinky Jew," flagging J.J.'s use of racial and religious slurs, and that he also advised the administration of J.J.'s behavior during the two disciplinary meetings he had with the school in February 2018. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 211–12, 216–17, 234–38; Pl.'s Decl., ECF No. 48-3, ¶¶ 11, 15, 17.) In addition, Ringel emailed Defendants regarding J.J.'s continued misconduct toward Ringel and the other students — expressly mentioning J.J.'s disparaging remarks about Ringel's religion — on March 28, 2018, and April 10, 2018, respectively. (Pl.'s 56.1, ECF No. 48-1, ¶¶ 270, 282; Mar. 28, 2018 Emails, ECF No. 48-20; Apr. 10, 2018 Email, ECF No. 48-23.)

Because Ringel has produced evidence showing that he complained about J.J.'s discriminatory conduct to school administrators on a relatively regular basis beginning soon after he arrived at P.S. 156 in the fall of 2017, the Court finds that the first two prongs of Ringel's prima facie retaliation claim are satisfied. *See Berger-Rothberg*, 803 F. Supp. 2d at 166; *see also Livingston v. City of New York*, No. 19-CV-5209 (KPF), 2021 WL 4443126, at *25 (S.D.N.Y. Sept. 28, 2021) ("[G]iven Plaintiff's assertion that he felt

'hostility' based on his 'beliefs,' the Court finds that Plaintiff's emails . . . may be protected activity.").

Adverse Action

To establish an adverse employment action, plaintiffs "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Bowen-Hooks*, 13 F. Supp. 3d at 224 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Terry*, 336 F.3d at 138); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). In determining "material adversity[,] . . . . '[c]ontext matters,' as some actions may take on more or less significance depending on the context." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69). Therefore, "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.* (citing *Hicks*, 593 F.3d at 165); *see also Rivera*, 743 F.3d at 25 (same).

Defendants do not dispute that Ringel's discontinuance constituted an adverse employment action. (Defs.' Mem., ECF No. 47-1, at 40.)[27] They do, however, contend

---

[27] As discussed *supra* note 3, Ringel appears to dispute when Defendants actually commenced his discontinuance. Defendant Moore-Allen indicated that she was preparing to recommend that Ringel be discontinued in February 2018 (*see* February 2018 Emails, ECF No.

that Defendants' corporal punishment investigations and letters to file do not constitute adverse employment actions for purposes of Ringel's retaliation claims. (*Id.* at 21.)[28] While the Court agrees with Defendants that, contrary to Ringel's arguments (*see* Pl.'s Mem., ECF No. 48, at 21–22), Defendants' initiation of corporal punishment investigations against him do not qualify as adverse employment actions, the Court finds that the letters to file could.

Regarding the initiation of investigations, the record shows that students and staff lodged serious corporal punishment and misconduct allegations against Ringel, prompting scrutiny in accordance with well-established DOE procedures. (*See* Defs.' 56.1, ECF No. 47-2, ¶¶ 18–23, 44, 49, 55, 61, 66.) "[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). The "relevant question" in this context is whether Defendants "applied reasonable disciplinary procedures to [Ringel] or if the[y] exceeded those procedures and thereby changed the terms and conditions of employment." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph*,

---

48-8), but also testified that she formally filed the "complete packet" related to her recommendation of discontinuance in May 2018. (Moore-Allen Dep., ECF No. 47-8, at 131:6–14; *see also* Pl.'s 56.1, ECF No. 48-1, ¶ 229.) However, the record shows that Ringel was made aware of his pending discontinuance on or about September 5, 2018, and that Defendant Pate issued her final decision affirming his discontinuance on October 4, 2018. (*See* Pl.'s Notebook, ECF No. 48-6, at 45; Sept. 4, 2018 Letter, ECF No. 47-30; Oct. 4, 2018 Letter, ECF No. 47-32.) For the purposes of this analysis, there is no dispute regarding the fact that Ringel suffered a materially adverse employment action when he was discontinued in the fall of 2018.

[28] Defendants also argue that, in the Title VII discrimination context, letters to file are not adverse employment actions. (Defs.' Mem., ECF No. 47-1, at 6–7.) The Court notes, however, that "[t]hough the phraseology is the same, the concept of an 'adverse employment action' is broader in the retaliation context than in the discrimination context." *Chung v. City Univ. of New York*, 605 F. App'x 20, 23 n.1 (2d Cir. 2015) (summary order) (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67; *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 n.6 (2d Cir. 2010)). In addition, as discussed *infra* Section II.C, the Court is recommending that summary judgment be granted as to Ringel's claims of discrimination under Title VII.

465 F.3d at 92 n.1). To the extent that Ringel argues these investigations were unreasonable from the get-go because P.S. 156 administrators failed to investigate other staff members for similar conduct, Ringel has produced no evidence that other teachers brought reptiles to school (or lost pets at school), or were accused of pushing students and dragging them down the stairs. *Cf. Chen*, 805 F.3d at 73 ("Without such comparators — or some other evidence suggesting that the [defendant] acted on retaliatory motives — no reasonable jury could decide that [defendant]'s decision to prioritize the complaints against [plaintiff] . . . evinces such motives.").

Ringel's reliance on Dean Haynes' testimony that students sometimes had to be restrained or physically removed in certain situations, and his own observations regarding other teachers' use of force and having classroom pets (*see* Pl.'s Mem., ECF No. 48, at 23; Pl.'s 56.1, ECF No. 48-1, ¶¶ 167–69, 316), are insufficient to create a genuine issue of material fact when viewed against the totality of the record evidence. *See Meyer v. Shinseki*, No. 12-CV-6337 (DLI) (ST), 2016 WL 11263169, at *9 (E.D.N.Y. July 28, 2016) ("Plaintiff has made the type of conclusory and self-serving statement, without direct or circumstantial evidence to support the charge, that is insufficient to create a genuine issue of material fact to defeat a motion for summary judgment." (quotation marks omitted)), *report and recommendation adopted*, No. 12-CV-6337 (DLI) (ST), 2016 WL 8673140 (E.D.N.Y. Sept. 30, 2016), *aff'd sub nom. Meyer v. Shulkin*, 710 F. App'x 453 (2d Cir. 2017) (summary order); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . .").

As to the letters to file, however, the Court notes that there is some ambiguity in the law regarding whether such letters constitute adverse employment actions. *Compare Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006) ("Reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment

actions."), *with Eubanks*, 2021 WL 1110587, at *15 (explaining that in the context of a retaliation claim, "[l]etters to File may constitute adverse actions that would dissuade a reasonable person from complaining of unlawful activity." (quotation marks omitted)).

In this case, Defendants issued Ringel five letters to file between March 8, 2018 and May 8, 2018, including two on April 9, 2018, and two on May 8, 2018. (Mar. 8, 2018 Letter to File, ECF No. 47-14; Apr. 9, 2018 Letter to File, ECF No. 47-19; Apr. 9, 2018 Letter to File, ECF No. 47-23; May 8, 2018 Letter to File, ECF No. 47-17; May 8, 2018 Letter to File, ECF No. 47-21.)[29] Without weighing the evidence or making any determinations as to the sufficiency or substance of the investigations instigating these letters, the Court concludes that a reasonable jury could find that the letters, when viewed separately or in the aggregate, constituted materially adverse employment actions. Notably, many of the letters were later cited by Defendants during Ringel's appeal of his discontinuance before the DOE Chancellor's Committee. (*See* May 10, 2019 DOE Mem., ECF No. 47-9, at 2.) Accordingly, the Court finds that Ringel has presented evidence of one or more adverse employment actions and has, therefore, established the third prong of his prima facie retaliation case. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57; *see also Chioke v. Dep't of Educ. of City of New York*, No. 15-CV-1845 (ERK) (CLP), 2018 WL 3118268, at *13 (E.D.N.Y. June 25, 2018); *Richard v. New York City Dep't of Educ.*, No. 16-CV-957 (MKB), 2017 WL 1232498, at *19 (E.D.N.Y. Mar. 31, 2017).[30]

---

[29] The Court notes two additional, belated inquiries pertaining to OSI investigations 18-05653X and 18-06624X, which were initiated in May and June 2019 in response to incidents that occurred in May and June 2018. (*See* Pl.'s 56.1, ECF No. 48-1, ¶¶ 61–64, 66–69.) However, as Ringel acknowledges, these investigations occurred after he was discontinued (*see id.*), and therefore the Court finds they do not bear upon this analysis.

[30] The Court further notes that "[a] hostile work environment itself can constitute an adverse employment action, the third prong required to establish retaliation." *Mohammed v. New York City Dep't of Educ.*, 932 F. Supp. 2d 420, 429 (E.D.N.Y. 2013) (quoting *Berger-Rothberg*, 803 F. Supp. 2d at 166).

<u>Causal Connection</u>

Finally, a causal connection between a plaintiff's protected activity and the adverse employment action they suffered "can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Leftridge*, 2020 WL 1503665, at *10 (quoting *Littlejohn*, 795 F.3d at 319); *see also Geras*, 149 F. Supp. 3d at 330. As the Second Circuit has explained, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). Notably, the circuit has "not drawn a bright line" defining "the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Rather, courts are permitted to "exercise . . . judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.*; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Here, the Court finds that Ringel has made out a prima facie case of causation sufficient to shift the burden back to Defendants. Specifically, the April and May 2018

letters to file in response to OSI investigations 18-01138X, 18-01287X, 18-01518X, and 18-00896X — incidents that occurred in January and February 2018 — were each issued weeks after Ringel engaged in protected activity; namely, his filing of the March 2018 OEO complaint and sending emails to the school administration in March and April 2018 complaining about J.J.'s religion-based harassment. Additionally, the school issued the March 8, 2018 letter to file in response to OSI investigation 17-10706X just weeks after Ringel raised J.J.'s discriminatory behavior during his own disciplinary meetings with the P.S. 156 administrators in February 2018.

Although this sequence and timing could be coincidental, at this stage of the analysis, Ringel's alleged adverse employment actions could reasonably be viewed as close enough in time to his participation in protected activity to infer causation. *See Eubanks*, 2021 WL 1110587, at *17 ("Because each of the adverse actions occurred briefly after [plaintiff]'s protected activity, the Court concludes that this is sufficient to raise [a] genuine issue of material fact as to whether the adverse actions constituted retaliation."). Moreover, viewing the facts in the light most favorable to Ringel, the bundling of the April and May 2018 letters to file near the end of the school year could be viewed as opportunistically timed to bolster Defendant Moore-Allen's formal recommendation of Ringel's discontinuance, further supporting a claim of retaliation. *See, e.g.*, *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) ("[T]his close temporal relationship is made even closer by the fact that the adverse action occurred at the first actual opportunity to retaliate."); *Espinal*, 558 F.3d at 129–30. Furthermore, evaluating temporal proximity from Ringel's March 29, 2018 OEO complaint to when he was formally discontinued on October 4, 2018, as Defendants suggest (*see* Defs.' Mem., ECF No. 47-1, at 21), does not necessarily generate a gap too large to establish a causal link. *See Espinal*, 558 F.3d at 129 (finding the "passage of only six months . . . sufficient to

support an inference of a causal connection"); *see also Geras*, 149 F. Supp. 3d at 332–33 (same).

Accordingly, the Court finds that Ringel has established a prima facie case of retaliation under Title VII and NYSHRL. *See, e.g., Rasmy*, 952 F.3d at 392 ("Whether [plaintiff]'s firing five months after a complaint of discrimination was caused by his complaints or, as [defendant] argues, by his fight with [a colleague], raises a factual issue that should be decided by a jury. . . . As our cases hold, the question of what motivated an employer's desire to fire a worker is a quintessential jury function.").[31]

      ii.   *Defendants' Legitimate, Non-Retaliatory Reasons*

The next step in the *McDonnell Douglas* analysis shifts the burden back to Defendants to "demonstrate that there were legitimate, non-retaliatory reasons for [the] adverse actions." *Summa*, 708 F.3d at 129; *see also Bowen-Hooks*, 13 F. Supp. 3d at 230. For this inquiry, Defendants point to, *inter alia*, the "numerous substantiated allegations of corporal punishment" against Ringel. (Defs.' Mem., ECF No. 47-1, at 23; *see also* Defs.' 56.1, ECF No. 47-2, ¶¶ 23, 26–27, 29, 31–34, 44–53, 55, 59–62, 65–66, 69.) Here, the Court finds Ringel's well-documented disciplinary record and the serious, substantiated allegations of corporal punishment (including one incident in which a student was taken to the hospital), sufficient to shift the burden back to Ringel to come forward with evidence that Defendants' "non-retaliatory reason is a mere pretext for retaliation." *Zann Kwan*, 737 F.3d at 845; *see also Mercedes v. Dep't of Educ. of City of New York*, No. 16-

---

[31] As discussed above, the Court is less persuaded by Ringel's conclusory assertions that he has demonstrated causation circumstantially through his treatment as compared to Defendants' treatment of other staff members. (*See, e.g.*, Pl.'s Mem., ECF No. 48, at 23, 30.) However, because the Court finds temporal proximity alone to be sufficient for Ringel's prima facie case, *Kaytor*, 609 F.3d at 552, it need not determine whether there were "fellow employees who engaged in similar conduct." *Leftridge*, 2020 WL 1503665, at *10; *cf. Redd v. New York State Div. of Parole*, 923 F. Supp. 2d 371, 390–91 (E.D.N.Y. 2012); *Birch v. JP Morgan Chase & Co.*, 685 F. Supp. 2d 350, 356 (E.D.N.Y. 2010).

CV-3284 (VSB), 2018 WL 4682015, at *12 (S.D.N.Y. Sept. 28, 2018), *aff'd*, 779 F. App'x 44 (2d Cir. 2019) (summary order).

iii.    *Ringel's Evidence of Pretext*

To defeat summary judgment, a plaintiff is required to show that "retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846; *see also Leftridge*, 2020 WL 1503665, at *10. To make such a showing, a plaintiff "may rely on evidence comprising [their] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations . . . ." *Giscombe v. New York City Dep't of Educ.*, 39 F. Supp. 3d 396, 403 (S.D.N.Y. 2014). Plaintiffs can also show pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons." *Id.* at 403–04; *see also Zann Kwan*, 737 F.3d at 846. In addition, "[e]ven if the employer had 'objectively valid grounds for the discharge,' Title VII is nonetheless violated if 'the employer was motivated by retaliatory animus.'" *McPartlan-Hurson v. Westchester Cmty. Coll.*, No. 13-CV-2467 (NSR), 2018 WL 3104094, at *15 (S.D.N.Y. June 21, 2018) (quoting *Summer v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)), *aff'd*, 804 F. App'x 41 (2d Cir. 2020) (summary order).

Ringel argues that Defendants' decision to discontinue his probationary employment was pretextual because Defendant Moore-Allen stated that her recommendation to Defendant Pate was based on substantiated allegations of corporal

41

punishment, even though she made her decision on or about February 9, 2018, "prior to any allegations . . . being substantiated against Plaintiff." (Pl.'s Mem., ECF No. 48, at 21, 25–26; *see also* February 2018 Emails, ECF No. 48-8.) As set forth above, AP LaMont-Agard met with Ringel regarding the first allegation of corporal punishment against him on February 14, 2018, and that allegation was formally substantiated in a letter dated March 8, 2018, i.e., after Defendant Moore-Allen claims to have made the decision to discontinue him. (*See* Defs.' 56.1, ECF No. 47-2, ¶¶ 26–27, 31, 35; Mar. 8, 2018 Letter to File, ECF No. 47-14; *but see* Pl.'s 56.1, ECF No. 48-1, ¶ 77.)[32] Defendants contend, however, that Ringel cannot show that he would have maintained his probationary employment but for his participation in protected activity, and that Ringel's disagreements with the findings of their investigations are insufficient to establish pretext. (Defs.' Mem., ECF No. 47-1, at 23–24; Defs.' Reply, ECF No. 49, at 8–9.)

As to Ringel's discontinuance, Defendants' emails between February 9, 2018, and February 12, 2018, show that Defendant Moore-Allen was contemplating ending Ringel's employment three months before she formally recommended Ringel be discontinued, and three months after Ringel first complained of J.J.'s behavior. (*See* February 2018 Emails, ECF No. 48-8.) The Court is aware that the February emails were prompted by a particularly troubling allegation of corporal punishment against Ringel. (*See id.* (referencing the allegations related to Ringel dragging a student down the stairs, resulting in OSI File 18-01518X).) However, given that Ringel had complained to school administrators regarding J.J.'s discriminatory behavior on multiple occasions by that point (*see* Pl.'s 56.1, ECF No. 48-1, ¶¶ 209–11, 216–217), and in light of the potential

---

[32] Ringel also vehemently disputes the allegations contained in the letters to file resulting from Defendants' misconduct investigations, and claims the letters and investigations were themselves pretextual. (Pl.'s Mem., ECF No. 48, at 26–33.)

inconsistency in Defendant Moore-Allen's later testimony that her reason for recommending Ringel's discontinuance was "[h]is substantiated corporal punishment cases," (Moore-Allen Dep., ECF No. 47-29, at 55:7–9, 88:18–89:2), the Court finds that Ringel has raised a triable issue as to Defendants' motivations for his discontinuance.[33] This factual dispute is also bolstered by the fact that two out of the three DOE Chancellor's Committee members concluded that the decision to discontinue Ringel should be reversed. (May 10, 2019 DOE Mem., ECF No. 47-9, at 4.)

In other words, despite the record evidence supporting Defendants' contention that the corporal punishment allegations motivated Ringel's discontinuance, the Court cannot conclude as a matter of law at this stage that Ringel would have been discontinued in the absence of his complaints about J.J. *See Rasmy*, 952 F.3d at 392; *O'Toole as Tr. of Est. of Fratto v. Cty. of Orange*, No. 16-CV-2059 (NSR), 2019 WL 1099721, at *12 (S.D.N.Y. Mar. 8, 2019) ("The Second Circuit has repeatedly explained that a plaintiff need not convince a jury that retaliation was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of a retaliatory motive." (emphasis in original) (quotation marks omitted)); *McPartlan-Hurson*, 2018 WL 3104094, at *16–17 (concluding, *inter alia*, that defendants'

---

[33] Ringel also argues that there is "a triable issue of fact for a jury whether [Defendant Pate's] decision to discontinue [Ringel] was based on Defendant Moore-Allen's recommendation that [he] be discontinued." (Pl.'s Mem., ECF No. 48, at 26.) Defendant Pate's letter affirming Defendant Moore-Allen's recommendation stated that she made her decision "after reviewing all the appropriate documentation." (Defs.' 56.1, ECF No. 47-2, ¶ 87.) Further, Defendant Pate later testified at her deposition that her decision to affirm Ringel's discontinuance was due to his "substandard teaching practices," and that she reviewed his tenure binder and other relevant documentation. (*Id.* ¶ 88; Pate Dep., ECF No. 47-29, at 43:12–44:8, 46:13–19, 47:11–18.) Though Defendant Pate appears further removed from the initial decisionmaking process, the Court notes that she was copied on the February 2018 emails described above, and therefore at least aware of Defendant Moore-Allen's position on the matter. (February 2018 Emails, ECF No. 48-8.) Accordingly, though the record does not support a standalone inference that Defendant Pate was acting out of retaliatory animus, her role in Ringel's discontinuance is intertwined with Defendant Moore-Allen's such that it constitutes a question of fact that should be reserved for a jury. *See Rasmy*, 952 F.3d at 392.

"contradictions and inconsistencies . . . demonstrate an issue of credibility this Court is not permitted to resolve on a motion for summary judgment"). In light of Ringel's disciplinary history here, a jury may well conclude that Defendants had valid, non-pretextual reasons to discharge him. Nevertheless, under the summary judgment standard, and due to the intersecting timelines of Ringel's participation in protected activity and the chain of disciplinary actions he faced, the Court finds that Ringel has plausibly raised a triable issue of fact regarding the true motivations behind his discontinuance.

In addition, as to Ringel's arguments regarding the letters to file and the underlying investigations, the Court recognizes — as Defendants point out (Defs.' Reply, ECF No. 49) — that "the fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008). Still, "in circumstances where the veracity of the employer's explanation and/or the thoroughness of the investigation is disputed," the Court will "examine the entire record to determine whether there is evidence from which a reasonable jury could conclude that the deficiencies in the employer's investigation and/or the incorrect conclusion reached by the employer can be attributed to a[n improper] motive." *Id.* at 188.

Without weighing the evidence or making credibility determinations, the Court finds that Ringel has raised a genuine issue for trial regarding whether Defendants' disciplinary letters were pretextual. For instance, Defendants assert that the backlog in cases at P.S. 156 caused the delay in conducting the investigations and issuing the

corresponding letters to file in OSI investigation 18-01287X (February 2018 allegation that J.J. and Ringel pushed each other) and OSI investigation 18-00896X (January 2018 pet snake incident). (LaMont-Agard Dep., ECF No. 47-12, at 98:22–99:13; Moore-Allen Dep., ECF No. 47-8, at 153:17–22.) Ringel claims that Defendants "needed time to develop a paper trail in order to justify" his discontinuance. (Pl.'s Mem., ECF No. 48, at 33.) Although it is clear that by the spring of 2018, Ringel was "skating on very thin ice," in light of the totality of the evidence presented, the Court "cannot confidently say that *no* reasonable jury could find that, absent the retaliatory animus, [Defendants] still would have issued the [letters to file]." *Chioke*, 2018 WL 3118268, at *14 (emphasis in original). As noted above, in the weeks leading up to Defendant Moore-Allen's formal recommendation that Ringel be discontinued, two letters were issued to Ringel's file on April 9, 2018, and two on May 8, 2018, in response to incidents which had occurred in January and February 2018. Though it is not necessarily likely, the Court finds that a reasonable juror could infer that the lag time in these letters supports an inference of retaliatory animus.

*   *   *   *   *

Overall, the potential inconsistencies in Defendants' proffered reasons for the timing of the letters to file and the bases for the decision to discontinue Ringel lead the Court to conclude that a rational trier of fact could find in Ringel's favor. Whether Ringel will ultimately prevail on his retaliation claim is beyond the scope of the instant motion and not an appropriate subject for the Court's speculation.

The record in this case depicts an extremely fraught situation due to a variety of factors, many of which the trier of fact could attribute to Plaintiff himself. However, Ringel has produced evidence showing that one of the causal factors leading Defendants to take adverse employment actions may have been Defendants' retaliatory

motivations in response to Ringel's frequent complaints about J.J.'s harassment. Accordingly, the Court finds that granting summary judgment would be inappropriate. *See Chioke v. Dep't of Educ. of City of New York*, No. 15-CV-1845 (ERK) (CLP), 2018 WL 5446796, at *4 (E.D.N.Y. Oct. 29, 2018) ("In a close case like this one, '[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.'" (quoting *Zann Kwan*, 737 F.3d at 843, 846 n.5)); *see also Gale v. City of Bridgeport*, No. 19-CV-631 (MPS), 2021 WL 4477388, at *13 (D. Conn. Sept. 30, 2021); *Lall*, 2021 WL 848851, at *10; *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 665 (E.D.N.Y. 2015); *Giscombe*, 39 F. Supp. 3d at 404.

The Court accordingly recommends that the Defendants' motion be denied as to Ringel's Title VII and NYSHRL retaliation claims.

2. <u>NYCHRL Claim</u>

NYCHRL retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *Adams*, 837 F. Supp. 2d at 128. However, "[u]nlike Title VII and the NYSHRL, retaliation claims under the NYCHRL do not require the plaintiff to prove any materially adverse employment action." *Id.* "Instead, plaintiffs 'must prove that something happened that would be reasonably likely to deter a person from engaging in a protected activity.'" *Id.* (quoting *Ellis v. City of New York*, No. 08-CV-7605 (DAB), 2011 WL 3279057, at *9 (S.D.N.Y.2011)); *see also Smith v. City of New York*, 385 F. Supp. 3d 323, 345–46 (S.D.N.Y. 2019) ("The elements of a prima facie case of retaliation under Title VII, the NYSHRL, and the NYCHRL are 'identical,' except that the NYCHRL employs a broader standard of an 'adverse employment action' than its

federal and state counterparts." (quoting *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016))).

As noted above, Ringel has established a prima facie retaliation case. Because the NYCHRL inquiry is "broader than its federal counterpart," *Leftridge*, 2020 WL 1503665, at *12, and in light of the Court's finding that Ringel has demonstrated triable issues of fact as to whether Defendants' non-retaliatory reasons for his discontinuance and letters to file were pretextual, the Court respectfully recommends that Defendants' motion as to Ringel's NYCHRL retaliation claim be denied as well. *See Berger-Rothberg*, 803 F. Supp. 2d at 167 n.7; *see also Eubanks*, 2021 WL 1110587, at *19.

## C. Ringel's Discrimination Claims

Defendants argue in their reply that Ringel has abandoned any "non-hostile work environment discrimination" claims under Title VII, the NYSHRL, and the NYCHRL, because his opposition memorandum does not address Defendants' arguments on these claims. (Defs.' Reply, ECF No. 49, at 2; *see also* Defs.' Mem., ECF No. 47-1, at 4–9, 15–17.) The Court notes that Ringel's causes of action under Title VII, the NYSHRL, and the NYCHRL are set forth in the amended complaint under a heading entitled "Discrimination and Retaliation," and Ringel cursorily alleges that Defendants "discriminated and retaliated against [him] based on race and religious discrimination," and that he has suffered "[a]s a result of Defendants' discriminatory and retaliatory actions[.]" (Am. Compl., ECF No. 21, ¶¶ 56, 60; *see also id.* ¶¶ 62, 66 (alleging same under the NYSHRL); *id.* ¶¶ 68, 72 (alleging same under the NYCHRL).) In addition, Ringel argues on summary judgment, at least in passing, that "as the only Jewish teacher at his school, [he] has established that he was treated less well than his comparators." (Pl.'s Mem., ECF No. 48, at 2.) Ringel has not, however, demonstrated that there are material issues of fact in dispute that preclude summary judgment on a

standalone discrimination claim, to the extent that Ringel is alleging one. *See Berger-Rothberg*, 803 F. Supp. 2d at 163 ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). Therefore, even if the Court were to find that Ringel has preserved his claims that Defendants discriminated against him due to his religion or race, which is not clear from his opposition papers, Defendants would still be entitled to summary judgment.

First, Ringel concedes that Defendants Moore-Allen and Pate never made any comments about Ringel's religion or used any slurs against him. (*See* Pl.'s 56.1, ECF No. 48-1, ¶ 126.) Second, Ringel has not identified a genuine issue for trial as to whether Defendants took any of the alleged adverse employment actions because of Ringel's race or religion. As discussed above, although Ringel includes a perfunctory claim of disparate treatment, he does not proffer direct evidence in support of this assertion or any comparators from which to draw circumstantial inferences. Viewing the record as a whole, Ringel's allegations and the available evidence are insufficient to sustain a standalone claim of discrimination. Rather, his allegations are best understood as supporting his hostile work environment claim arising from "student-on-teacher" harassment. (*See generally* Pl.'s Mem., ECF No. 48, at 5–19.)

In short, Ringel has failed to "'show circumstances that would be sufficient to permit a rational finder of fact to infer that'" that the DOE's "employment decisions were 'more likely than not based in whole or in part on discrimination.'" *Chen*, 805 F.3d at 74 (quoting *Feingold*, 366 at 152). Accordingly, the Court respectfully recommends that summary judgment be granted as to Ringel's standalone discrimination claim to the extent he is making one. Ringel has not brought forth "particular parts of materials in the record" that demonstrate the presence of a genuine dispute of fact as to such a

claim, Fed. R. Civ. P. 56(c)(1)(A), and the bare facts he has alleged that could support such a claim are conclusory and insufficient. *See Appling v. City of New York*, No. 18-CV-5486 (MKB), 2021 WL 695061, at *1 n.1 (E.D.N.Y. Feb. 23, 2021); *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267–68 (E.D.N.Y. 2009). *Cf. Hoag*, 279 F. Supp. 3d at 483. In summary, Ringel has failed to establish a prima facie case of discrimination or causation as required under *McDonnell Douglas.*

**D. Ringel's § 1983 Claim**

Ringel's final claim, though styled as to all three Defendants (*see* Am. Compl., ECF No. 21, ¶¶ 73–76), appears solely focused on Defendant Moore-Allen, for her role in causing Ringel's alleged detention in her office on September 27, 2018.[34] (Pl.'s 56.1, ECF No. 48-1, ¶¶ 130–36.) For the reasons discussed below, the Court respectfully recommends granting Defendants' motion with respect to Ringel's § 1983 claim because Defendant Moore-Allen is entitled to qualified immunity.

1. <u>Applicable Law</u>

a) *False Arrest*

In order to maintain a claim under § 1983, "two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Savarese v. City of New York*, No.

---

[34] It is well settled that only the person "responsible for the alleged constitutional deprivation" is appropriately named as a defendant in a § 1983 action. *Al-Jundi v. Est. of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989).

18-CV-5956 (LJL), 2021 WL 2784501, at *16 (S.D.N.Y. July 2, 2021) (alteration in original). Additionally, as relevant here, a § 1983 claim for false arrest is derived from "the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

For a false arrest claim to withstand summary judgment, a plaintiff must show "a genuine issue of material fact on four elements: '(1) the defendant intended to confine [him], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *McCarthy v. Roosevelt Union Free Sch. Dist.*, No. 15-CV-1468 (JFB) (SIL), 2017 WL 4155334, at *5 (E.D.N.Y. Sept. 19, 2017) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003)). "Confinement is privileged, and a complete defense exists to a claim for false arrest and imprisonment when it is supported by probable cause." *Savarese*, 2021 WL 2784501, at *6.

### b) *Qualified Immunity*

"'Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights.'" *Moskowitz v. Great Neck Union Free Sch. Dist.*, No. 20-CV-1659 (KAM) (SIL), 2021 WL 4268138, at *18 (E.D.N.Y. Aug. 4, 2021) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)), *report and recommendation adopted*, No. 20-CV-1659 (KAM) (SIL), 2021 WL 3878777 (E.D.N.Y. Aug. 31, 2021); *see also Biswas v. City of New York*, 973 F. Supp. 2d 504, 520 (S.D.N.Y. 2013); *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 773 (S.D.N.Y. 2011). "[A]s the Supreme Court has repeatedly recognized, 'qualified immunity protects all but the plainly incompetent or those who knowingly

violate the law.'" *Triolo v. Nassau County*, ___ F.4th ___, 2022 WL 186567, at *6 (2d Cir.

Jan. 21, 2022) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017)). In the context of

false arrest, the Second Circuit recently reiterated that "an officer may be entitled to

qualified immunity on a § 1983 false arrest claim if his actions were objectively

reasonable or if arguable probable cause existed at the time of the arrest." *Triolo*, 2022

WL 186567, at *5 (quotation marks omitted); *see also Raspardo*, 770 F.3d at 113; *Biswas*,

973 F. Supp. 2d at 520.

2. <u>Analysis</u>

The facts and circumstances surrounding the events of September 27, 2018 are

essentially undisputed. Ringel went to P.S. 156 in order to review his personnel file.

(Defs.' 56.1, ECF No. 47-2, ¶ 130; Pl.'s Dep., ECF No. 47-5, at 91:12–20.) While reviewing

his file in Defendant Moore-Allen's office, in the presence of Defendant Moore-Allen

and school safety agents, Ringel noticed that a copy of his retainer agreement with his

attorney was in the file. (Defs.' 56.1, ECF No. 47-2, ¶ 131; Pl.'s Dep., ECF No. 47-5, at

90:23–91:4, 92:22–93:4.)[35] Ringel attempted to remove the retainer agreement from his

file and leave the office. (Defs.' 56.1, ECF No. 47-2, ¶¶ 133, 135; Pl.'s 56.1, ECF No. 48-1,

¶¶ 133, 135.)[36] Defendant Moore-Allen instructed the school safety agents that he was

---

[35] Ringel noted at deposition that he later realized the retainer agreement was in his file because he had accidentally emailed it to the school. (Pl.'s Dep., ECF No. 47-5, at 91:5–11.)

[36] Because she was sitting at her desk, and Ringel was sitting at her conference table, Defendant Moore-Allen said that she did not see what document Ringel was attempting to remove. (Moore-Allen Dep., ECF No. 47-8, at 160:10–13.) At her deposition, Moore-Allen testified that she was instructed by DOE counsel over the phone that "anything in the file belongs to DOE and that he must return it," and thus, when Ringel tried to leave, she said: "School safety, he cannot leave with those documents." (*Id*. at 162:23–24, 163:21–164:17; *see also* Pl.'s Dep., ECF No. 47-5, at 95:2–6.) Although there is a potential question of fact presented as to whether Defendant Moore-Allen knew what document Ringel sought to take, it is immaterial to the Court's analysis that the document was Ringel's retainer agreement.

not to leave before returning the document. (Moore-Allen Dep., ECF No. 47-8, at 163:21–164:17; *see also* Pl.'s Dep., ECF No. 47-5, at 95:2–6.)

At his deposition, Ringel stated that there are two doors in Defendant Moore-Allen's office, "[o]ne leading to the hallway and one leading to the main office," and that when he tried to walk toward one of the doors, "[t]he safety agent moved her body to make sure to block [him] from exiting." (Pl.'s Dep., ECF No. 47-5, at 93:24–94:11; *see also* Defs.' 56.1, ECF No. 47-2, ¶ 135.) Ringel then made a phone call to his attorney, returned the document to his file, and was allowed to leave. (*See* Pl.'s Dep., ECF No. 47-5, at 94:12–23; Moore-Allen Dep., ECF No. 47-8, at 164:4–8; Defs.' 56.1, ECF No. 47-2, ¶ 136.) In addition, although Ringel alleges in the amended complaint that he was "detained" for "at least one hour, between approximately 3:30 p.m. and 4:30 p.m." (Am. Compl., ECF No. 21, ¶ 48), the record is unclear about how much time actually passed before Ringel was allowed to leave. (*See generally* Defs.' 56.1, ECF No. 47-2, ¶¶ 133–36; Pl.'s 56.1, ECF No. 48-1, ¶¶ 133–36, 338; Pl.'s Dep., ECF No. 47-5, at 94:3–95:6; Moore-Allen Dep., ECF No. 47-8, at 163:24–164:8.)

Based on these facts, the parties do not appear to dispute that the school safety agents, acting on information provided by Defendant Moore-Allen, intended to confine Ringel, that Ringel was conscious of his confinement, and that he did not consent to the confinement. *See McCarthy*, 2017 WL 4155334, at *5. Defendants argue that stopping Ringel was justifiable, or privileged, because the school safety agents "were present and observed [Ringel] committing the unauthorized removal," and therefore had probable cause. (Defs.' Mem., ECF No. 47-1, at 26.) Ringel's argument, however, is that although Defendant Moore-Allen did not block the door herself, she should be held liable because the school safety agents were "simply blindly following [her] orders," rather than acting on their own accord on the basis of probable cause. (Pl.'s Mem., ECF No. 48,

at 35.) From there, Ringel contends that "there is a triable issue of fact as to whether Defendant Moore-Allen herself effectuated [his] detention[.]" (*Id.*) Further, Ringel argues that Defendant Moore-Allen is not entitled to qualified immunity because no "reasonable administrator would believe that a retainer agreement is somehow property of the DOE," and "no reasonable administrator would believe it is permissible for them to effectuate a citizen's arrest on an individual attempting to remove the document from their personnel file." (*Id.* at 35–36.)

The Court finds that Defendant Moore-Allen is entitled to qualified immunity because it would have been objectively reasonable for her to believe that her conduct during the September 27, 2018 encounter did not violate Ringel's rights and because Ringel has failed to allege a violation of clearly established rights. Given the rather sparse record and briefing on this issue,[37] this approach avoids the comparatively "more difficult question of whether the relevant facts make out a constitutional question at all," including but not limited to the question of whether Defendant Moore-Allen could herself be responsible for the school safety agents' actions. *Pearson v. Callahan*, 555 U.S. 223, 239 (2009) (holding that the court may reach the question of whether qualified immunity applies without first deciding whether a constitutional right was violated).

a) *Objectively Reasonable*

Assuming *arguendo* that Defendant Moore-Allen was aware that the document in question was Ringel's retainer agreement, temporarily detaining him so as to prevent the removal of the contents of his personnel file was objectively reasonable. Defendant

---

[37] The Court notes that Ringel did not cite any precedent or authority other than the Fourth Amendment in his amended complaint and summary judgment briefing. (*See* Am. Compl., ECF No. 21, ¶¶ 73–76; Pl.'s Mem., ECF No. 48, at 34–36.) In addition, the Court does not address the question of whether the school safety agents had independent probable cause to prevent Ringel from leaving. Those individuals have not been named in this case, and their understanding of the facts and circumstances is not apparent from the record.

Moore-Allen was acting on the express advice of an attorney from the DOE, who told her that "anything in the file belongs to DOE[.]" (Moore-Allen Dep., ECF No. 47-8, at 162:23–24, 164:3.) Moreover, during this incident, Ringel contacted his own attorney, after which Ringel returned the document. (*See* Pl.'s Dep., ECF No. 47-5, at 94:12–23; Moore-Allen Dep., ECF No. 47-8, at 164:4–8.) On these facts, the Court finds that it would have been "objectively reasonable for [Defendant Moore-Allen] to believe that h[er] conduct did not violate [Ringel]'s rights." *Moskowitz*, 2021 WL 4268138, at *18; *see also Chambers*, 815 F. Supp. 2d at 775–76 (holding at summary judgment that "even if Plaintiffs could establish a violation of [constitutional rights], the [school official] Defendants would be entitled to qualified immunity" because "the qualified immunity defense typically applies . . . where a public actor exercises his or her discretion in the performance of official duties in the reasonable belief that no wrong is being done" (citing *Wyatt v. Cole*, 504 U.S. 158, 167 (1992))).

> b)  *Clearly Established Right*

The Court also finds that Ringel has failed to establish that any of his clearly established rights were violated. *See Ziglar*, 137 S. Ct. at 1866–67. Specifically, Ringel has not demonstrated that Defendant Moore-Allen's temporarily stopping and detaining him to prevent the removal of the contents of his personnel file — which was arguably DOE property — violated Ringel's clearly established rights under the Fourth Amendment. *See generally Triolo*, 2022 WL 186567, at *4–5.

For all of these reasons, the Court respectfully recommends finding that Defendant Moore-Allen is entitled to qualified immunity, and that Defendants' motion for summary judgment be granted as to Ringel's false arrest claim.

## CONCLUSION

For the reasons contained herein, the Court respectfully recommends that Defendants' motion for summary judgment (ECF No. 47) be granted in part and denied in part. Specifically, the Court recommends that Defendants' motion be denied as to Ringel's hostile work environment and retaliation claims under Title VII, the NYSHRL, and the NYCHRL, and that summary judgment be granted as to Ringel's standalone discrimination claim and his § 1983 claim.

\*   \*   \*   \*   \*

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a), (e) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g.*, *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

**SO ORDERED.**

Dated:   Brooklyn, New York
         February 4, 2022

_____
*Taryn A. Merkl*
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE